**SO ORDERED.**

**SIGNED this 19th day of September, 2012.**





Robert E. Nugent
United States Chief Bankruptcy Judge

PUBLISHED

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MICHELLE R. BROWN, | ) | Case No. 11-12293 |
| | ) | **Chapter 7** |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| CARL B. DAVIS, Trustee | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Adversary No. 11-5239 |
| | ) | |
| MICHELLE R. BROWN, LEGACY BANK and | ) | |
| KANSAS MEDICAL CENTER, L.L.C. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER GRANTING LEGACY BANK'S MOTION FOR SUMMARY
JUDGMENT AND DENYING THE TRUSTEE'S MOTION
<u>FOR SUMMARY JUDGMENT</u>**

1

These are cross-motions for summary judgment filed by the trustee, Carl B. Davis, and the defendant Legacy Bank on the Trustee's complaint to avoid the Bank's security interest in Michelle Brown's ownership interest in the Kansas Medical Center, L.L.C.[1] The Bank claims to have a lien in her 7 units of that company; the controversy here arises because it described those units on all of its security documents as "7 shares of preferred stock." The Trustee filed a five-count complaint. In Count I, the Trustee seeks to determine the secured status of the Bank in the units and, in Count IV, he invokes his hypothetical lien creditor powers under 11 U.S.C. § 544(a) in his attempt to avoid this lien. The other counts seek turnover of the units, leave to sell them under 11 U.S.C. § 363(f), and the marshaling of assets. The parties made no mention of the turnover, sale or marshaling counts in their summary judgment motions. The Court concludes that Brown's interest in the LLC is a general intangible and that, while the Bank's description of it is somewhat inaccurate, it still meets the "reasonable identification" standard of KAN. STAT. ANN. § 84-9-108. The Bank's Assignment and Control Agreement are therefore sufficient to effect attachment and the financing statement it filed perfected the Bank's security interest in Brown's LLC units.[2]

*Jurisdiction*

The trustee's complaint to determine the validity of the Bank's lien in the debtor's LLC units and to avoid that lien under 11 U.S.C. § 544 is a core proceeding over which this Court may exercise subject matter jurisdiction.[3]

---

[1] On July 10, 2012, the Court heard oral argument on the motions. The trustee Carl Davis appeared by counsel Kenneth Jack. Legacy Bank appeared by counsel Creath Pollack.

[2] Unless otherwise indicated all statutory references are to the Uniform Commercial Code [UCC] as adopted in Kansas, specifically Kansas Statutes Annotated (2011 Supp.), chapter 84, articles 8 and 9.

[3] 28 U.S.C. § 157(b)(1) and (b)(2)(K) and § 1334(b).

*Summary Judgment Standards*

Fed. R. Civ. P. 56(c), incorporated in adversary proceedings by Fed. R. Bankr. P. 7056, directs the entry of summary judgment in favor of a party who "shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." The Court's function in reviewing a motion for summary judgment is to first determine whether genuine disputes as to material facts exist for trial. In making this determination, the Court may not weigh the evidence nor resolve fact issues.[4] Once the Court determines which facts are not in dispute, it must then determine whether those uncontroverted facts establish a sufficient legal basis upon which to grant movant judgment as a matter of law.[5]

This matter is well-suited to summary determination where the uncontroverted material facts are established by the documentary evidence submitted by the parties. There is no dispute here how the debtor's ownership interest in the LLC was characterized and described on the relevant security documents. The task for this Court is to determine whether that description was sufficient as a matter of law, applying the relevant provisions of the Uniform Commercial Code.

*Facts*

The following facts are undisputed and are established by the documentary evidence submitted. Dr. Michelle Brown borrowed $315,000 from the Bank in July of 2010. She gave the Bank a note and executed two security documents: an Assignment of Investment Property/Securities (Assignment) and

---

[4] *First Sec. Bank of New Mexico, N.A. v. Pan Am. Bank*, 215 F.3d 1147, 1154 (10th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)); *Concrete Works of Colo., Inc. v. City and Cnty of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (Court may not resolve disputed questions of fact at the summary judgment stage).

[5] *E.E.O.C. v. Lady Baltimore Foods, Inc.*, 643 F.Supp. 406, 407 (D. Kan. 1986) (Even if there are no genuine issue of material fact, the movant still has the burden to show it is entitled to judgment as a matter of law.).

3

an Uncertificated Securities Control Agreement (Control Agreement).[6] She executed a financing statement that the Bank filed with the Secretary of State. The terms of the note refer to it being secured by, among other things, an "Assignment of Investment Property/Securities - KANSAS MEDICAL CENTER, LLC."[7] The note also references a "Security Agreement" signed by Dr. Brown. The Assignment and Control Agreement are part of the record on summary judgment; the security agreement is not.

Paragraph 2 of the Assignment reads "To secure the payment . . . of the [note], I assign and grant a security interest to you in all of the Property described in this Agreement that I own . . . ." Paragraph 3 defines the "Property" as "Investment Property/Securities: 7.000 shares of Preferred Stock in KANSAS MEDICAL CENTER, LLC, held by KANSAS MEDICAL CENTER, LLC, 1124 W 21st Street, Andover, KS 67002 recorded in my name." Other than proceeds and replacements, no other property is described in the Assignment. The Control Agreement was signed by the Bank, Dr. Brown, and a representative of Kansas Medical Center, Steven Hadley. Kansas Medical Center is referred to as the Issuer and, in the agreement, the Issuer agrees "to comply with the instructions originated by the Secured Party without further consent by the Debtor." The property that is subject to the agreement "includes the following Investment Property and all proceeds and products . . ." and describes the "7.000 shares of Preferred stock" referenced in the Assignment. Dr. Brown executed and the Bank filed a financing statement that refers to "Margin Stock/Securities (uncertificated): 7.000 shares of preferred stock in KANSAS MEDICAL CENTER, LLC, held by KANSAS MEDICAL CENTER, LLC, 1124 W 21st Street, Andover, KS 67002 recorded in Debtor's [Brown's] name."[8]

---

[6] Adv. Dkt. 21-1 (Note); 21-2 (Assignment); and 21-4 (Control Agreement)

[7] Adv. Dkt. 21-1, ¶ 10.

[8] Adv. Dkt. 21-6.

4

Dr. Brown owned 7 units in the LLC.[9] She did not own shares of preferred stock in it–no stock was issued. The LLC's operating agreement, filed under seal here, makes no provision for the issuing of stock; rather those members contributing capital received units, defined as "an instrument used for purposes of determining certain votes and making certain allocations of profits and losses." There are no "instruments" in the summary judgment record.

Included among the exhibits in support of the Bank's summary judgment motion are two letters, one dated January 24, 2012 from KMC's counsel to the Bank's counsel, together with a list of members in KMC showing Dr. Brown's ownership of 7 "units" in the LLC, and a second letter dated July 28, 2010 from the Bank's vice-president addressed "To Whom It May Concern" stating the Bank's agreement to be bound by KMC's Operating Agreement in the event the Bank pursues remedies under Dr. Brown's Security Agreement and "takes control or ownership of the 'Units' pledged."[10] In reliance on that exhibit, the Bank asserts as fact that the ownership interests in KMC are uncertificated, issued and maintained by KMC.[11] The trustee admits that fact. The Bank also asserts that the July 28, 2010 letter is "part of the Control Agreement."[12] The trustee admits the authenticity of the July 28 letter but denies that it is part of the Control Agreement, citing to the existence of an integration clause in the Control Agreement and the lack of execution of the letter by the debtor and KMC. These letters reflect that as between KMC and the Bank, the parties recognized and accurately characterized Dr. Brown's ownership interest in KMC as 7 "units." Why this description of Dr. Brown's interest in the LLC was never used on the security documents remains a mystery.

---

[9] Adv. Dkt. 21-3, p.2.

[10] Adv. Dkt. 21-3, Ex. C.

[11] Adv. Dkt. 21, p. 2, ¶ 3.

[12] Adv. Dkt. 21, p. 2, ¶ 6.

5

*Analysis*

**1.    The LLC units are general intangibles, not investment property.**

Both parties focus their arguments on whether the LLC units are adequately described in the security documents, both assuming for purposes of that discussion that the collateral is "investment property." In doing this, they both skip a critical step in the Article Nine analysis: determining into what collateral "type" or category the LLC units fall.[13] Because these units are not securities as that term is defined in Article Eight, they are not investment property; rather, they are general intangibles.[14]

The Bank's documents refer to the units variously as "investment property," "uncertificated securities," or "margin stock." The units are none of these things. The term "investment property" is defined in § 84-9-102(a)(49) of the UCC as "a *security*, whether certificated or uncertificated. . . ." A "security" is defined in Article Eight at § 84-8-102(a)(15) and its definition applies in Article Nine by virtue of § 84-9-102(b). A "security" is defined as an "obligation of an issuer or a share, participation or other interest in an issuer or in property or an enterprise of an issuer" "except as otherwise provided in K.S.A. § 84-8-103."[15] KAN. STAT. ANN. § 84-8-103(c) expressly excludes LLC units like those at issue

---

[13] *See* KAN. STAT. ANN. § 84-9-102(a)(12) (defining collateral as the property subject to a security interest. Types of collateral include goods, § 84-9-102(a)(44); inventory, § 84-9-102(a)(48); farm products, § 84-9-102(a)(34); equipment, § 84-9-102(a)(33); general intangibles, § 84-9-102(a)(42); accounts, § 84-9-102(a)(2); chattel paper, § 84-9-102(a)(11); investment property, § 84-9-102(a)(49); consumer goods, § 84-9-102(a)(23); and payment intangibles, § 84-9-102(a)(61).

[14] Barkley and Barbara Clark, 1 THE LAW OF SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE, ¶2.04[7] (3rd ed. 2011); *See also In re Turley,* 172 F.3d 671 (9th Cir. 1999) (stock that auto racer had to buy as member of auto racing franchise was general intangible under UCC, not a certificated security); *In re Mintz,* 192 B.R. 313 (Bankr. D. Mass. 1996) (debtor's interest in limited partnership and corresponding distribution rights were not uncertificated securities, but instead were general intangibles); *In re Dreiling,* 2007 WL 172364; No. 05-64189 (Bankr. W.D. Mo. Jan. 18, 2007) (Debtors' interest in a Kansas limited liability company was a general intangible).

[15] KAN. STAT. ANN. § 84-8-102(a)(15).

6

here from the definition of "security."[16] It states –

> (c) *An interest in a partnership or limited liability company is not a security* unless it is dealt in or traded on securities exchanges or in securities markets, its terms expressly provide that it is a security governed by this article, or it is an investment company security. However, an interest in a partnership or limited liability company is a financial asset if it is held in a securities account.[17]

None of the conditions listed in § 8-103(c) are met by the units in question here. The units are not traded on any market and the operating agreement makes no provision for Article Eight to apply to them. KMC is a hospital, not an investment company. Because these units are not securities under Article Eight, they cannot be investment property under Article Nine.

Instead, these units are general intangibles. That term is defined at § 84-9-102(a)(42) as –

> any personal property, including things in action, *other than* accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, *investment property*, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software.[18]

As these units fit none of the enumerated exclusions, particularly investment property, they fall into the catch-all category of personal property and are general intangibles.

    **2.    The Bank's Assignment and Control Agreement suffice (just barely) to attach a security interest in general intangibles.**

In order for a security interest to attach to collateral, it must be enforceable. Section 9-203(b) sets out three requirements for enforceability. First, the secured party must give value.[19] Second, the debtor must have rights in the collateral.[20] And, third, some form of security instrument describing the

---

[16] *See* OFFICIAL UCC COMMENT 4, § 84-8-103(c).

[17] KAN. STAT. ANN. § 84-8-103 (emphasis added).

[18] KAN. STAT. ANN. § 84-9-102(a)(42) (emphasis added).

[19] § 84-9-203(b)(1).

[20] § 84-9-203(b)(2).

7

collateral must be executed (or "authenticated" in UCC parlance) or the secured party have taken possession of it.[21] There is no dispute that the first two conditions are met here: the Bank lent Brown money and she owned the LLC units. What is hotly disputed is whether the Bank's interest attached. The dispute turns on the poor job the Bank did in describing Brown's collateral.

Attachment occurs if one of four conditions is met. They are: (1) the debtor signs a security agreement that describes the collateral;[22] (2) the collateral "is not a certificated security" and is in the secured party's possession under § 9-313 pursuant to the security agreement;[23] (3) the collateral is a registered certificated security and the secured party takes delivery of the certificate under § 8-301;[24] or (4) the collateral is investment property of which the secured party has control under § 9-106.[25] The trustee argues that the collateral is not adequately described and therefore doesn't meet the requirements of the first condition, § 9-203(b)(3)(A), while the Bank claims that it has "possession" of the collateral under the Control Agreement under § 9-203(b)(3)(B). Because the units are not securities in registered form, the third condition plainly does not apply.[26] And, because the units are not investment property, the attachment by control provisions in § 9-203(b)(3)(D) do not apply either.

The Bank documents, taken together, amount to "a security agreement that provides a

---

[21] § 84-9-203(b)(3).

[22] § 84-9-203(b)(3)(A).

[23] § 84-9-203(b)(3)(B).

[24] § 84-9-203(b)(3)(C).

[25] § 84-9-203(b)(3)(D).

[26] *See* § 8-102(a)(4) defining a "certificated security" as a security that is represented by a certificate and § 8–102(a)(18) defining an "uncertificated security" as a security without a certificate.

8

description of the collateral."[27] None of the documents is entitled "security agreement" but the Assignment contains granting language that states: "To secure the payment and performance of the Secured Debts, I [Brown] assign and *grant a security interest to you in all of the Property described in this Agreement that I own* . . . ." The note's terms include a statement that it will be secured by separate security instruments, including an "Assignment of Investment Property/Securities - KANSAS MEDICAL CENTER, LLC."[28] The Assignment's terms also refer only to investment property or securities, specifically 7.000 shares of Preferred stock in the LLC: there is no catch-all provision that might be read to incorporate general intangibles into its reach.[29] Both the note and the Assignment authorize the Bank to file a financing statement covering the "Property" to perfect its security interest.[30] The Control Agreement "includes" in the described collateral reference "the following Investment Property . . .," followed by the more specific description of 7 shares of preferred stock recorded in Brown's name and held by the LLC.[31] The use of the word "includes" leaves open the possibility that other UCC types of collateral might be included. The collateral is both miscategorized as investment property and misdescribed as preferred stock.[32] Preferred stock is issued by a corporation to accord its holders preference over the holders of common stock in the distribution of dividends or, in the event of

---

[27] § 9-102(a)(72) defines a "security agreement" as an agreement that creates or provides for a security interest while § 1-201(a)(35) states that a "security interest" means an interest in personal property that secures payment or performance of an obligation.

[28] Adv. Dkt. 21-1, p. 2, ¶ 10.

[29] Adv. Dkt. 21-2, p. 1, ¶ 3.

[30] Adv. Dkt. 21-1, p. 3, ¶ 12; Adv. Dkt. 21-2, p. 2, ¶ 10.

[31] Adv. Dkt. 21-4, p. 1, ¶ 2.

[32] The title of the Control Agreement also misdescribes Brown's interest in the LLC as "Uncertificated Securities."

9

liquidation, assets. Limited liability company units are issued to investors in LLC's to evidence members' relative rights in the distribution of profits and liability for losses. Only if the Court can conclude that the Bank's note, Assignment, and Control Agreement, read together as a security agreement, contain descriptive terms that point to Dr. Brown's equity interest in KMC can it conclude that the Bank's security interest attached. But because the Bank used the wrong UCC collateral type-word "investment property" in its security documents, the sufficiency of the description is rightly open to question.

The collateral description serves the purpose of identifying that part of the debtor's property which the secured party's lien encumbers. UCC § 9-108(b) provides the yardstick for judging whether a description is adequate to the task. If it "reasonably identifies" the collateral, it is. Collateral is reasonably identified if it is identified by a "specific listing," category, UCC collateral type, quantity, computational formula, or "any other method, if the identity of the collateral is objectively determinable." The Bank's description is "specific" but inaccurate because it refers to 7 shares of preferred stock in a LLC – LLCs don't issue stock. The Bank chose the wrong category and UCC collateral type-word – LLC units aren't securities, preferred stock or investment property. The Assignment does identify the correct quantity of ownership units, though it calls them shares of preferred stock. It is silent as to computational method. The Control Agreement's property reference "includes" investment property, opening the possibility that KMC might be retaining something other than securities. That leaves the question under § 9-108(b)(6): whether the identity of the units is "objectively determinable." Does the description "do the job assigned to it: make possible the identification of the collateral described?"[33]

Kansas case law in this area is sparse, but on point. The Bank relies heavily on *John Deere Co. v. Butler Co. Implement, Inc.*, where the Kansas Supreme Court considered whether a lender's security

---

[33] § 84-9-108, OFFICIAL UCC COMMENT 2.

agreement that referred to a John Deere dealer's inventory and new and used equipment as listed on certain exhibits included after-acquired property.[34] Finding no after-acquired language, the court had no hesitation finding that the lender's security interest did not attach to after-acquired property. However, the bank's second security agreement that described the collateral as the dealer's interest in "all equipment, used equipment and parts inventory" was held to include the debtor's equipment inventory, even though the bank did not employ the "inventory" category in the description. Referring to the Kansas comments to former § 84-9-110, the precursor to § 9-108, the court held that a description in a security agreement must be such that it allows third persons, "aided by reasonable inquiries which the instrument itself suggests, to identify the property."[35] If the document "gives clues sufficient that third persons by reasonable care and diligence may ascertain the property covered, it is adequate."[36] Concluding that "equipment " commonly describes what implement dealers sell and that the security agreement's clear reference to equipment "now owned or hereafter acquired" clearly referred to equipment that might be acquired in the future for resale, the court held that the failure of the bank to use the word "inventory" to describe its collateral was not fatal to the bank's claim to the dealer's inventory. The Trustee responds that the *John Deere* case does not apply here because in that case, the security agreement referred to equipment that existed; here the security agreement referred to preferred stock that never existed.

---

[34] 232 Kan. 273, 655 P.2d 124 (1982), *partially superseded by statute on other grounds, Bank of Kansas v. Hutchinson Health Serv.,* 246 Kan. 83, 785 P.2d 1349 (1990)(K.S.A. § 44-717(c) was amended after *John Deere* to bring interpleader actions within its reach; this statute and the portion of the *John Deere* decision addressing its applicability in that case has no bearing on the instant case before this Court.).

[35] *Id.* at 282.

[36] *Id. See also,* § 84-9-110 (1996), KANSAS COMMENT, 1996. OFFICIAL UCC COMMENT 2 to current § 84-9-108 notes that the current statute "retains substantially the same formulation" as the former version, § 84-9-110.

11

Professor Clark comments that the *John Deere* court "may have gone too far in holding that a misclassification of farm machinery held by a dealer for sale as equipment rather than inventory was not a fatal error in description" and that "another court might conclude that an error in generic description is fatal, given the separate Article 9 categories and the ease with which the creditor could avoid the problem . . . ."[37] Like the Kansas Supreme Court, this Court does not "condon[e] the careless draftsmanship giving rise to this issue."[38] And, like Professor Clark, I find it hard to justify the repeated mischaracterization of these not-uncommon assets when the Uniform Commercial Code so clearly states into what category they fall. Clearly, the Bank presumed Brown's interests in the LLC were "uncertificated securities" and relied on its preprinted forms instead of common sense in documenting its lien in Brown's 7 LLC units.[39] That said, while the Assignment "lacks [accurate] details," it "gives clues" that would allow a third party to ascertain what property of Dr. Brown's she pledged to repay the note. The language of the note, the Assignment, and the Control Agreement all suggest that she intended to pledge her interest in Kansas Medical Center, LLC. Her name and address are supplied; a third party could make inquiry of her. Likewise, the name and address of the issuer, KMC, are also supplied. A third party could easily contact the hospital or its representatives for further information. Finally, the quantum of Brown's interest in the LLC was accurately depicted, even if its legal nature was not.

If the point of a reasonable description in the security documents is to make what part of the

---

[37] Barkley and Barbara Clark, 1 THE LAW OF SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE, ¶2.03[3][a] (3rd ed. 2011).

[38] 232 Kan. at 282.

[39] Had the Bank used a common security agreement form and claimed a lien in Brown's "general intangibles" or "all of debtor's interest in Kansas Medical Center, LLC" this would be a much simpler case.

debtor's property is encumbered "objectively determinable," the facts in this case support my concluding that this description suffices to attach the security interest. Dr. Brown owned no stock, but she did own 7 units in the LLC. The security instrument described the number of units and identifies the issuing entity as a limited liability company. As LLCs typically do not issue "stock," a reader could reasonably conclude that the "preferred stock" was, in fact, a membership interest. The Trustee admits that KMC issued and maintained the membership units and did not controvert that KMC wrote a letter to the Bank stating as much. And, there is no doubt that these units are what Dr. Brown offered and what the Bank received as security for the repayment of its note.

The Assignment, the Control Agreement, and the correspondence allow me to conclude that Dr. Brown granted an interest in her 7 "shares" of Kansas Medical Center, LLC. The reference to stock is incorrect, but not fatally misleading. It suggests that Dr. Brown owns, and has pledged, her 7 units of "equity" interest in the company -- the nature of that interest is "objectively determinable." By an admittedly thin margin, the Bank's description "reasonably identifies" the collateral under § 9-108 and therefore complies with § 9-203(b)(3)(A). The Bank's security interest attached to Dr. Brown's 7 units in Kansas Medical Center, LLC.

### 3. The Bank's financing statement perfected its security interest in the LLC units.

A security interest in general intangibles may only be perfected by filing a financing statement.[40]

---

[40] § 84-9-310(a). *See also In re Turley,* 172 F.3d 671 (9th Cir. 1999) (stock that auto racer had to buy as member of auto racing franchise was general intangible under UCC, not a certificated security, and could only be perfected by filing financing statement; bank's possession of stock certificate did not perfect security interest and was without consequence); *In re Mintz,* 192 B.R. 313 (Bankr. D. Mass. 1996) (debtor's interest in limited partnership and corresponding distribution rights were not uncertificated securities and bank was not required to perfect security interest therein under Article 8 of the UCC, but by filing a financing statement for general intangibles under Article 9); *In re Dreiling,* 2007 WL 172364; No. 05-64189 (Bankr. W.D. Mo. Jan. 18, 2007) (Security interest in debtor's interest in Kansas limited liability company was a general intangible and required to be perfected by filing a financing statement).

13

A financing statement is sufficient to perfect a security interest when it contains the names of the debtor and the secured party, and when it "indicates the collateral covered."[41] The "indication" of the collateral is sufficient if it meets the description standards set out in § 9-108.[42] The Bank's financing statement exhibits yet more "careless draftsmanship" by referring to the collateral as "margin stock/securities (uncertificated)" and describing it as "7.000 shares of preferred stock" in Kansas Medical Center.[43] But the statement also contains KMC's address and correctly identifies the number of shares of interest that Dr. Brown owns. The misnomers "margin stock," "uncertificated securities," and "preferred stock" are not enough to render the financing statement seriously misleading and, as set out above, the description meets the requirements of § 9-108, if only by a hair.

*Conclusion*

The Bank's security documents successfully attached and perfected its security interest in Michelle Brown's membership units in Kansas Medical Center, LLC. There are no issues of material fact and the Bank is entitled to judgment as a matter of law. The Trustee's motion for summary judgment is therefore DENIED and the Bank's motion for summary judgment is GRANTED. Partial judgment for the Bank on Counts I and IV of the Trustee's complaint will be entered. A judgment on decision will issue forthwith.

The Trustee is directed to prepare and submit an agreed final pretrial order on Counts II, III, and V of his complaint not later than 28 days from the entry of this order and the Clerk is directed to set this proceeding for final pretrial conference and trial thereafter.

# # #

---

[41] § 84-9-502(a).

[42] § 84-9-504(a) (adopting § 9-108's "reasonably identifies" description standard).

[43] Adv. Dkt. 21-6.